**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

| | |
|---|---|
| United Food & Commercial Workers Union, Local No. 663, | No. 25-cv-2891 (KMM/EMB) |
| Plaintiff, | |
| v. | **ORDER** |
| Seneca Foods Corporation, | |
| Defendant. | |

---

This case arises from an arbitration of a labor dispute and the parties' disagreements about the effect of the arbitrator's decision. The Plaintiff, United Food & Commercial Workers Union, Local No. 663 ("the Union"), asks the Court to confirm the arbitration award. The Defendant, Seneca Foods Corporation ("Seneca"), seeks a declaration that there is no valid arbitration award to confirm. If the arbitration award is valid, Seneca alternatively asks the Court to declare that it has no application after December 31, 2025. The parties have filed cross-motions for summary judgment. As discussed below, the Court grants the Union's motion to the extent it seeks confirmation of the award and, as a result, dismisses Seneca's first counterclaim. The Court also grants Seneca's motion to the extent it seeks a declaration that the arbitration award does not apply after December 2025. Finally, the Court denies both parties' requests for an award of attorney fees.

## BACKGROUND

Seneca processes fruits and vegetables for sale in the United States. It has a frozen-food packaging and distribution facility in Rochester, Minnesota. The Union is a labor

organization, 29 U.S.C. § 152(5), that represents the interests of approximately 166 employees who work at Seneca's Rochester facility. The Union and Seneca are parties to a Collective Bargaining Agreement ("CBA") that governs their relationship from February 1, 2024 through February 1, 2028.

The CBA contains provisions addressing Union members' paid time off ("PTO"). However, the CBA itself does not spell out the terms that apply to employees' accrual and use of PTO. The contract instead incorporates by reference a corporate PTO policy applicable to all of Seneca's Minnesota employees. (CBA, Art. 8, § 1 ("All employees are eligible to participate in the paid time off policy applicable to Minnesota employees in accordance with the terms of the policy.") [Dkt. 1-1].) Before the current CBA was ratified, Seneca had a PTO policy that handled employee vacation and sick time separately, but in 2023, the Minnesota Legislature enacted the Earned Sick and Safe Time Act ("ESSTA"). *See* Minn. Stat. §§ 181.9445–.9448. Among other things, the ESSTA provides a system by which Minnesota employees accrue earned sick and safe time and allows employees to use that accrued time for a variety of reasons, such as employees' illnesses or their family members' health care. Minn. Stat. §§ 181.9446 (accrual), 181.9447, subd. 1 (use). Seneca determined that its previous approach to PTO was non-compliant with the ESSTA,[1] so on January 1, 2024, it adopted the Minnesota State Paid Time Off Policy for Regular Employees ("2024 PTO Policy"). (2024 PTO Policy [Dkt. 25-1].)

---

[1] *See* Dkt. 29 at 3 n.1 (explaining Seneca's response to the ESSTA). Citations are to ECF pagination.

Under the 2024 PTO Policy, when a Seneca employee accrued PTO and sought to take a day off of work, she could redeem PTO so that she still got paid when she missed her shift. Seneca, however, occasionally schedules employees to work mandatory overtime, meaning that its employees can sometimes be scheduled to work ten-hour or twelve-hour shifts instead of a typical eight-hour day. This caused disagreement between the Union and Seneca about whether the 2024 PTO Policy required an employee who missed a day of work for an ESSTA-qualifying reason to use more than eight hours of PTO if she was scheduled to work a ten-hour or twelve-hour shift that day.

At least with respect to this point of disagreement, the 2024 PTO Policy is not a model of clarity. The Policy says only the following:

> Each full *day* of paid MN PTO for regular non-exempt and exempt employees will be calculated at *normal scheduled hours* multiplied by the employee's straight time hourly rate of pay.

(2024 PTO Policy at 4 (emphasis added).) According to the Union, if an employee took a day off for an ESSTA qualifying reason, she would only have to use eight hours of PTO to account for the absence, even if she was scheduled to work mandatory overtime that day. The Union said that this understanding was consistent with how the parties' previous course of dealing defined a *day* for purposes of using up sick time. Under the Union's interpretation, if an employee was scheduled to work a twelve-hour shift, the employee would only be required to use up eight hours of accrued PTO, and she would keep four additional hours of PTO in the bank to use later.

3

However, in April of 2024, Seneca began implementing the 2024 PTO Policy based on its contrary interpretation of what the Policy required. Under its interpretation, if the employee was scheduled to work a twelve-hour shift, she would have to use twelve full hours of accrued PTO. This interpretation would no longer leave the additional four hours of accrued PTO for the employee to use later.

After Seneca adopted the 2024 PTO Policy, the Union filed a grievance asserting that Seneca "unilaterally changed the 'day' from 8 hours to all scheduled hours for purposes of ESST." (Grievance [Dkt. 1-2].) Seneca denied the Union's grievance, and the parties submitted their dispute for arbitration consistent with the CBA's dispute-resolution procedures. (CBA, Art. 9, §§ 1–4.) The Arbitrator[2] held a hearing in Rochester on November 20, 2024. Following the hearing, the parties submitted post-hearing briefing and framed the issues for the Arbitrator's decision. The Arbitrator described the parties' positions as follows:

> [Seneca's] view is that if an employee is scheduled to work more than eight hours and has an unplanned absence, the employee must use any applicable PTO hours to cover the length of the absence. The Union's view is that if the employee is scheduled to work more than eight hours, the employee is obligated to use no more than eight hours of PTO even if the length of the absence exceeds eight hours.

(Arbitration Award at 2 [Dkt. 4].)

On March 1, 2025, the Arbitrator issued his decision (hereafter "Arbitration Award" or "Award"). (*See id.*) The Arbitrator concluded that there would have been no agreement

---

[2] The parties selected Peter G. Davis to arbitrate their dispute, and the Court refers to Mr. Davis as "the Arbitrator" throughout this Order. (Arbitration Award at 1 [Dkt. 4].)

reached on this issue if the parties knew of their good faith misunderstanding. Because of that, the Arbitrator stated that he could not "in good consci[ence] issue an award that creates a winner and a loser" and indicated that his decision was "strongly influenced by [his] 50 years of mediating labor disputes[.]" (*Id.* at 3.) Ultimately, the Arbitrator reached the following conclusion:

> [I]t is my award that unless the parties otherwise agree, the new PTO benefit will alternately be applied to each disputed absence occurring on or after April 29, 2024 (the date the grievance was filed) in a manner first consistent with the Employer's view and then next with the Union's view.

(*Id.*)

After the arbitration hearing, but before the Arbitrator issued the Award, Seneca adopted a new PTO policy for its Minnesota employees, effective January 1, 2025 ("2025 PTO Policy"). (2025 PTO Policy [Dkt. 25-2].) In relevant part, Seneca changed the language of its PTO policy to more clearly reflect its own view of how PTO must be used when an employee's ESSTA qualified absence occurred on a day when she was scheduled to work more than 8 hours. The new policy states: "When using PTO-Sick-Personal time, an employee is required to use enough time to cover their actual shift/workday." (*Id.* at 4.) Seneca says that it adopted this new policy pursuant to a provision in the CBA that gives it "the right to make changes to the PTO policy[.]" (CBA, Art. 8, § 4.)

Following the issuance of the Arbitration Award, Seneca did not file any action to have the award vacated or modified. (Dkt. 15 at 3 (factual stipulations).) Instead, on July 16, 2025, the Union filed this case seeking to have the award confirmed. (Compl. [Dkt. 1].) In response, Seneca filed an answer denying that the Union was entitled to confirmation of

5

the Award. Seneca also filed two counterclaims. (Ans. & Countercls. [Dkt. 6].) In its counterclaims, Seneca first asks the Court to declare that there is no valid arbitration award to confirm. Second, if the Award is deemed valid, Seneca asks the Cour to declare it has no application after December 31, 2024 because Seneca exercised its right under the CBA to adopt a new PTO policy when it promulgated the 2025 PTO Policy, and the Union did not file a timely grievance challenging that policy.

## DISCUSSION

The material facts outlined above are not in dispute, but the parties disagree about their legal effect. The cross-motions for summary judgment largely mirror one another. Ultimately, the Court agrees with the Union that Seneca cannot now challenge the legitimacy of the Arbitration Award after failing to timely seek vacatur or modification of the Award. As a result, the Union is entitled to summary judgment on its confirmation claim, and Seneca's first declaratory-judgment claim is dismissed. However, the Court also finds that the Union failed to file a timely grievance concerning Seneca's adoption of the 2025 PTO Policy, so Seneca is entitled to summary judgment on its second counterclaim. Finally, the Court denies both parties' requests for an award of attorney fees.

## I.      Summary Judgment Standard

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Cearley v. Bobst Gr. N. Am. Inc.*, 129 F.4th 1066, 1069 (8th Cir. 2025). The moving party must demonstrate that the material facts are undisputed. *Celotex*, 477 U.S. at 322. A fact is "material" only if its resolution

6

could affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Lankford v. City of Plumerville*, 42 F.4th 918, 921 (8th Cir. 2022). A dispute of fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

When the moving party properly supports a motion for summary judgment, the party opposing summary judgment may not rest on mere allegations or denials, but must show, through the presentation of admissible evidence, that specific facts exist creating a genuine issue for trial. *Id.* at 256; *McGowen, Hurst, Clark & Smith, P.C. v. Com. Bank*, 11 F.4th 702, 710 (8th Cir. 2021). Courts must view the inferences to be drawn from the facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986); *Becker v. City of Hillsboro*, 125 F.4th 844, 851 (8th Cir. 2025).

When considering the Union's motion, the Court views the record in the light most favorable to Seneca, and when considering Seneca's motion, the court must view the record in the light most favorable to the Union. *Durand v. Fairview Health Servs.*, 230 F. Supp. 3d 959, 965 (D. Minn. 2017).

## II.   Confirmation of the Award

### A.  Legal Standards

The parties first dispute whether the Court should confirm the Arbitration Award. A party can seek to confirm or vacate an arbitration award pursuant to Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185(a). *See Int'l Ass'n of Heat & Frost Insulators, Loc. Union 34 v. Gen. Pipe Covering*, 792 F.2d 96, 98 (8th Cir. 1986);

*CenterPoint Energy Res. Corp. v. Gas Workers Union, Loc. No. 340*, 920 F.3d 1163, 1166 (8th Cir. 2019) (considering appeal from decision on motion to vacate); *Bureau of Engraving, Inc. v. Graphic Comm'cn Int'l Union, Loc. 1B*, 284 F.3d 821, 826 (8th Cir. 2002) (affirming district court's confirmation of arbitration award). When a court reviews an arbitration award in a suit brought under § 301 of the LMRA, its role is "very limited" because giving courts the "final say on the merits of awards" would weaken the "federal policy of settling labor disputes by arbitration." *Exide Techs. v. Int'l Bhd. of Elec. Workers, Loc. No. 700*, 964 F.3d 782, 786 (8th Cir. 2020) (quotations omitted).

Consistent with that limited role, district courts will allow an arbitration award to stand "[s]o long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority[.]" *CenterPoint Energy Res. Corp.*, 920 F.3d at 1166 (quotation omitted). Courts will not set aside the award even if the arbitrator made a "serious error" when interpreting the contract. *Id.* (quotation omitted). "Only when an arbitrator issues an award that does not draw its essence from the contract, because it reflects instead the arbitrator's own notions of industrial justice, may a court vacate an arbitrator's decision." *Id.* (quotation omitted).[3]

"A party seeking to challenge the validity of an arbitration award generally must file a timely motion to vacate that award." *Sheet Metal Workers Int'l Ass'n, Loc. Union No. 36 v. Systemaire, Inc.*, 241 F.3d 972, 975 (8th Cir. 2001). A party that fails to file a timely

---

[3] Courts also do not enforce arbitral decisions "procured by the parties through fraud or through the arbitrator's dishonesty." *Keebler Co. v. Milk Drivers & Dairy Empls. Union, Loc. No.*, 80 F.3d 284, 287 n.3 (8th Cir. 1996) (quoting *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 38 (1987)). Neither of these concerns is at issue here.

motion to vacate typically cannot later present any defenses to confirmation of the award that it could have raised through such a motion. *Id.* Because § 301(a) of the Labor Management Relations Act does not set forth its own statute of limitations for filing a motion to vacate, "a district court must borrow a statute of limitations from state law most analogous to the dispute." *Id.* (quoting *Loc. 2, Int'l Bhd. of Elec. Workers v. Anderson Underground Constr., Inc.*, 907 F.2d 74, 75 (8th Cir. 1990)). Here, the most analogous state law for an action to vacate an arbitration award is Minnesota's Uniform Arbitration Act ("MUAA"), Minn. Stat. § 572.19, subd. 2. *Grandlund v. Nw. Airlines, Inc.*, No. 01-969 (MJD/JGL), 2001 WL 1640038, at *2 (D. Minn. Dec. 12, 2001). The MUAA requires a party seeking to vacate an arbitration award to file a motion to vacate within 90 days after delivery of a copy of the award. *Id.*

### B. Analysis

The Union asserts that the Arbitration Award must be confirmed because Seneca had until June 6, 2025 to file a motion to vacate the award but failed to do so. That failure, the Union says, prevents Seneca from avoiding the effect of the Arbitrator's decision through counterclaims for a declaratory judgment or through the summary judgment procedures invoked here. Seneca does not dispute that it never filed a motion to vacate the award. Instead, Seneca argues that it was not required to take any step to vacate the Arbitration Award because the Award was not a valid decision by the Arbitrator resolving the parties' disagreement about the meaning of the 2024 PTO Policy. Therefore, Seneca seeks a declaratory judgment in its favor that there is no award to confirm. The Court finds that the Union has the better argument.

9

The Arbitration Award in this case is a decision on the merits of the parties' dispute. It resolved the grievance that the Union filed challenging Seneca's application of the 2024 PTO Policy. That Policy stated only that each full *day* of PTO would be calculated at normal scheduled hours multiplied by the employee's straight time hourly pay. But what constitutes a "day" is not defined, nor does the 2024 PTO Policy spell out how that provision should apply if an employee was scheduled to work more than eight hours on a day when she had to miss work. The Union's grievance asserted that Seneca had unilaterally redefined what constituted a "day." The Union essentially complained that Seneca changed a past practice of applying no more than eight hours of PTO for an unplanned absence regardless of how many hours the employee was scheduled to work and, instead, required employees to use PTO equivalent to all scheduled hours. The Arbitration Award identified the parties' dispute as one involving the meaning of the relevant language of the 2024 PTO Policy—an issue of contract interpretation. And the Arbitrator issued a decision that resolved the parties' disagreement over the meaning of the contract by concluding that the parties' competing understanding of those terms would "alternately be applied to each disputed absence occurring on or after April 29, 2024 (the date the grievance was filed) in a manner first consistent with the Employer's view and then next with the Union's view." (Arbitration Award at 3.) The parties got what they

bargained for—an arbitral decision resolving the issue raised in the Union's grievance.[4] Dissatisfied with that resolution, Seneca should have filed a motion to vacate or modify the award.

Seneca suggests otherwise, arguing that there was no award to vacate because the Arbitrator expressly declined to issue a decision on the merits. Seneca highlights two statements in the Award to support its argument. First, the Arbitrator stated that he could not "in good consci[ence] issue an award that creates a winner and a loser," and second, that the award "is strongly influenced by my fifty [sic] years of mediating labor disputes." (Dkt. 29 at 6 (quoting Arbitration Award at 3).) Thus, Seneca complains that the Arbitrator did not decide the issues as an arbitrator ought to and acted as a mediator, electing to "split the baby" with a process that "had no basis in the terms of the CBA." (*Id.*)

Seneca's efforts to reframe the Arbitrator's decision as *no decision at all* are unavailing because they are the very arguments that Seneca could have raised in a motion to vacate. Had Seneca filed a timely motion to vacate, it could have argued that the Arbitration Award was improper because it "had no basis in the terms of the CBA." That's precisely the kind of complaint that parties aggrieved by arbitration awards raise when they ask district courts to vacate them. Despite Seneca's efforts to rebrand its dissatisfaction with the nature of the Arbitrator's decision, it is complaining that the Arbitrator failed to

---

[4] The Union highlights several formal indicia that the Arbitrator's written ruling was an arbitration award. For example, the Arbitrator referred to the decision as an "Arbitration Award," signed the decision as "Arbitrator," and concluded the decision by stating "it is my award that" the parties' competing interpretations would be applied alternately. While these facts lend some weight to the Union's position, the Court does not find them to be dispositive.

11

consider the relevant contract language, failed to apply principles of contract interpretation, and substituted his own efforts to balance the equities of the situation. That is a claim that the Arbitrator imposed his own notions of industrial justice and that his decision failed to draw its essence from the parties' agreement. Seneca could have filed a motion to vacate the Arbitration Award asserting precisely those arguments, but it chose not to do so.[5]

In this circuit, that choice operates as a clear time bar to Seneca's belated effort in this litigation. "An employer may not assert a defense to a motion to enforce an arbitration award that could have been raised in an action to vacate." *Systemaire*, 241 F.3d at 976 (citing *Loc. Union No. 36 v. Atlas Air Conditioning Co.*, 926 F.2d 770, 772 (8th Cir. 1991)); *United Food & Com. Workers' Union, Loc. No. 293 v. Neb. Prime Grp., LLC*, No. 8:18-cv-466, 2019 WL 11271374, at \*3 (D. Neb. Jan. 28, 2019) (finding employer's objection to award untimely where it failed to file a motion to vacate within 90 days of receiving the award). In electing not to move to vacate the Arbitration Award, Seneca assumed the risk

---

[5] Seneca's focus on the communications with the Arbitrator after the Award was issued do not change this conclusion. Seneca complained to the Arbitrator that the parties "never received a decision" and, instead, got "a splitting of the baby (in an impossible manner) with zero analysis of the contract language. . . . This is not what you were hired to do." (Dkt. 29 at 7 (quoting Dkt. 31-1 at 1).) In response, the Arbitrator released the parties from any obligation to pay his fee and apologized that the "Award did not have the desired impact of forcing the parties back to the table to bargain a solution both sides could knowingly live with." (Dkt. 31-1 at 1.) Seneca contends that this exchange and the fact that the Union did not express any disagreement with the company's characterization of the Award show that there was no decision and Seneca had no obligation to timely move to vacate. But Seneca's criticism demonstrates that the complaint about the Award it raises now is no different from the arguments it could have raised in a motion to vacate. Saying that the Award was not a valid decision because there was "zero analysis of the contract language" is the same as arguing that an Award does not draw its essence from the parties' agreement.

that its inaction would preclude it from contesting whether the Arbitrator ignored the parties' contract or imposed his own brand of industrial justice. *Cf. Loc. 36 Sheet Metal Workers' Int'l Ass'n v. Whitney Mech. Contractors, Inc.*, No. 09-03201-CV-S-JTM, 2010 WL 11509172, at *3 (W.D. Mo. Jan. 21, 2010) ("[I]t remains risky and ill-advised to fail to register an objection to arbitration at every possible step[.]" (quoting *Int'l Bhood of Elec. Workers, Loc. Union No. 545 v. Hope Elec. Co.*, 380 F.3d 1084, 1103 (8th Cir. 2004) (first alteration in original))). The consequence of Seneca's choice not to act is that it cannot now receive a declaratory judgment that would have the effect of vacating the Arbitration Award.

The rationale for this rule is simple and it supports the outcome in this case. If Seneca were permitted to arrogate to itself the authority to decree that an arbitrator's decision is really "no decision at all," it could effectively eliminate any obligation for an employer to make a timely petition to vacate an unfavorable award. But the reason for requiring a timely motion to vacate is to promote finality and certainty in the area of labor arbitrations. If Seneca were correct, an employer could refuse to implement the arbitrator's award, wait until the employee or her union asks a court to confirm it, and then the employer could recast its challenge to the award as a claim that the arbitrator never resolved the dispute at all. That would cut against the policy favoring finality of arbitration decisions in labor disputes. *Loc. 689, Amalgamated Transit Union v. Wash. Metro. Area Transit Auth.*, 249 F. Supp. 3d 427, 437 (D.D.C. 2017) ("This rule [barring untimely challenges to arbitration awards] operates as an essential corollary to the federal policy according finality to labor awards because it prevents losing parties from needlessly dragging out the

13

proceedings." (citing *Turner v. United Steelworkers of Am.*, 581 F.3d 672, 676 (8th Cir. 2009))).

The caselaw cited by Seneca does nothing to change the Court's conclusion. For example, in both its opening brief and in its reply, Seneca asserts that the Arbitrator "did not do the job he was hired to do" and cites *Card v. Stratton Oakmont*, 933 F. Supp. 806 (D. Minn. 1996). In *Card*, the court described the federal judiciary's limited role in reviewing arbitral decisions under the Federal Arbitration Act by noting that "the court is limited to determining whether the arbitrators *did the job they were told to do*—not whether they did it well, or correctly, or reasonably, but simply whether they did it." *Id.* at 809 (emphasis added and quotation omitted). But Seneca merely leverages the rhetorical appeal of that italicized phrase. It does not point to any aspect of the *Card* court's ruling to suggest that it can reframe an award as a non-decision and thereby shirk its obligation to make a timely motion to vacate. *Card* certainly does not stand for that proposition, and neither does any other case relied on by Seneca.

More apt is the Union's comparison of this case to *Milk Drivers, Dairy & Ice Cream Emps., Loc. Union No. 387 v. Roberts Dairy*, No. 4:03-CV-40385, 2004 WL 729117 (S.D. Iowa Mar. 30, 2004). The governing CBA in *Milk Drivers* provided that an arbitral committee would have a certain structure, but the committee decided the disputed employee grievances without certain representatives present. *Id.* at *2–3. The employer took the position that those representatives were necessary for the committee to render a valid decision. *Id.* at *3. But after the committee issued an award favorable to the union, the employer did not file a motion to vacate arguing that the award should not be enforced

14

because it was contrary to the procedures laid out in the CBA. *Id.* at *7. Instead, the employer tried to raise that argument later, when the union sought to enforce the award in district court and moved for summary judgment. *Id.* at *4–5. Specifically, the employer argued that "summary judgment in its favor [was] proper because there [was] *no award to enforce*." *Id.* at *5 (emphasis added).

The *Milk Drivers* court rejected the employer's position. In doing so the Court pointed to the well-established rule that a party aggrieved by an arbitration award who does not file a timely motion to vacate cannot later raise a challenge to the award that he could have presented in such a motion. *Id.* at *6–7. Further, the court explained:

> The record clearly reflects the Company was aware of the circumstances and sensitive to the issues well within the limitations period. The only proffered reason for not moving to vacate the awards was the belief that the Committee could not render a decision in the grievance hearings and thus there was *no award to vacate*. This posture may very well have been successful; however, it must have been asserted in a motion to vacate. Because it was not, Roberts Dairy is now precluded from asserting it in the present action to enforce the arbitration awards.

*Id.* at *7 (emphasis added and footnote omitted). The same is true here. If Seneca raised the same challenge it presents in this case in a timely motion to vacate, it might very well have been successful. But Seneca was required to raise its concern in a timely motion to vacate and failing to do so means it is now precluded from asserting the issue.

15

Seneca's motion for summary judgment is, therefore, denied to the extent it seeks a declaration that there is no valid award to confirm. The Union's motion for summary judgment is granted to the extent it seeks confirmation of the Arbitration Award.[6]

### III.    The Effect of the Arbitration Award After December 31, 2024

The parties also dispute whether the Arbitration Award continues to govern the relationship between the parties or was, in effect, superseded by Seneca's adoption of the 2025 PTO Policy. Seneca argues that the Arbitration Award has no effect after December 31, 2024 because the company adopted the 2025 PTO Policy pursuant to its rights under the CBA, and the Union failed to file a grievance regarding the adoption of that policy. Seneca asserts that the parties have a real, substantial, existing controversy about the ongoing effect of the Arbitration Award on their relationship that should be settled by a declaratory judgment. The Union disagrees and argues that the Arbitration Award necessarily became a part of the CBA. According to the Union, if Seneca wished to have the effect of the Award temporally limited, it was required to seek to vacate or modify the award within 90 days after it issued. Because Seneca didn't do so, it cannot now obtain the declaratory judgment it seeks. Here, the Court finds that Seneca has the better argument.

---

[6] In their briefing, the parties have not addressed precisely what this Court's Order confirming the March 1, 2025 Arbitration Award requires Seneca to do given the Court's determination, below, that the Award is not effective after December 31, 2024. The record suggests that because Seneca believed that the Arbitration Award was not valid, it did not alter its conduct with respect to Union employees' use of PTO in response to the Award. Given the nature of the Award, presumably Seneca will have to review its own PTO records to determine what changes are necessary in restoring any accrued PTO hours to Union members where it required use of additional hours in a manner inconsistent with the Award.

*Scope of the Arbitration*

First, the Court concludes that the Arbitrator was not asked to decide any dispute about the effect of the 2025 PTO Policy on future disputes arising under the CBA. The Union suggests that the Arbitration Award necessarily became a part of the parties' agreement, thereby defining how PTO would be applied when an employee misses a mandatory-overtime shift. But the Union's position is contradicted by the undisputed facts. The record here demonstrates that neither the arbitration, nor the Arbitrator's award had anything to do with the 2025 PTO Policy. The 2024 PTO Policy went into effect in February 2024. On April 29, 2024, the Union filed its grievance challenging Seneca's determination about how accrued PTO would be applied under *that policy* if an employee missed a mandatory-overtime shift. The Arbitrator held a hearing on that issue on November 20, 2024, and the parties were invited to submit post-hearing briefing. Then, on December 10, 2024, Seneca gave notice that it had adopted the 2025 PTO Policy, which the company implemented on January 1, 2025. Thus, Seneca did not even announce the 2025 PTO Policy until after the arbitration hearing had concluded. And there was no grievance relating to that Policy (or Seneca's right to unilaterally implement it) before the Arbitrator. The Arbitration Award does not mention the 2025 PTO Policy and nothing in the record suggests that the Arbitrator had been asked in the parties' post-hearing briefing to consider the effect of the 2025 policy.

Under these circumstances, the Arbitrator could not have passed upon the meaning of the 2025 PTO Policy, nor could he have considered whether Seneca acted within its rights under the CBA when it adopted the new PTO policy. *See Loc. 238 Int'l Bhd. of*

17

*Teamsters v. Cargill, Inc.*, 66 F.3d 988, 990–91 (8th Cir. 1995) ("When two parties submit an issue to arbitration, it confers authority upon the arbitrator to decide *that* issue."). Those issues were never submitted to the Arbitrator, and he could no more resolve the parties' disputes about those issues than he could determine any other matter that was not submitted to him via a proper grievance. *See John Morrell & Co. v. Loc. Union 304A of United Food & Com. Workers*, 913 F.2d 544, 561 (8th Cir. 1990) (explaining that parties to an arbitration agreement give the arbitrator authority to act on their disagreement by submitting specific issues through the grievance process so that "the scope of the arbitrator's authority depends, in part, upon how the parties have framed the issues to be arbitrated") (citing cases); *Minn. Nurses Ass'n v. N. Mem. Health Care*, 822 F.3d 414, 418 (8th Cir. 2016) ("It is a settled rule that an arbitrator's authority is limited by the issues the parties present to him for a decision; he must stay within the areas marked out for his consideration, and may not go beyond the submission.") (cleaned up).[7]

The Court finds that the Award in this case neither explicitly, nor implicitly resolves the parties' dispute over the continuing effect, if any, of the Award following the effective date of the 2025 PTO Policy.

---

[7] The Court is also not persuaded by the Union's suggestion that if Seneca disagreed with the scope of the Arbitration Award or its applicability beyond December 31, 2024, it should have filed a motion to vacate or modify the Award within 90 days after the decision. (Dkt. 24 at 24–26.) Again, the Award does not say that it applies irrespective of the company's adoption of the 2025 PTO Policy because the Arbitrator did not have that issue before him when he issued his decision. Seneca quite reasonably concluded that if the parties were going to litigate any dispute about the announcement and implementation of the new 2025 policy, that would occur through a separate grievance and arbitration process.

### *Seneca's Second Counterclaim*

Seneca seeks summary judgment in its favor on the claim asserted in Count II of its Counterclaims. Seneca asks the Court to "enter a declaratory judgment pursuant to [the Declaratory Judgment Act], that the March 1, 2025 Arbitration Award, even if deemed valid, has no application after December 31, 2024." (Ans. & Countercls. at 12.) Seneca claims it had the right to implement the 2025 PTO Policy under the CBA, the Union never filed any grievance challenging the terms of the 2025 PTO Policy or its implementation, the time for the Union to do so has expired, and as a result the Arbitration Award cannot have any application after December 31, 2024. (*Id.* at 11, ¶¶ 17–20.)

The Declaratory Judgment Act states:

> In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.

28 U.S.C. § 2201(a). "District courts have discretion to decide whether to entertain declaratory judgment actions[.]" *BASF Corp. v. Symington*, 50 F.3d 555, 557 (8th Cir. 1995).

To obtain a declaratory judgment, "there must exist a substantial controversy between the parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Minn. Auto Dealers Ass'n v. Minn. ex rel. Minn. Pollution Control Agency*, 520 F. Supp. 3d 1126, 1140 (D. Minn. 2021) (quoting *Gopher Oil Co. v. Bunker*, 84 F.3d 1047, 1050 (8th Cir. 1996)). "One important purpose of declaratory judgments is to afford the parties 'relief from the uncertainty, insecurity, and

controversy giving rise to the proceeding.'" *Cath. Mut. Relief Soc. Of Am. v. Arrowood Indem. Co.*, 334 F. Supp. 3d 986, 994 (D. Minn. 2018) (quoting *Karsjens v. Jesson*, 6 F. Supp. 3d 958, 974 (D. Minn. 2014)).

Here, the parties have adverse legal interests, and there is a real, sufficiently immediate controversy concerning the applicability of the Arbitration Award now that the 2025 PTO Policy has gone into effect. Seneca says that the new policy governs any employee use of PTO from January 1, 2025 through the present, and the Union says that the Arbitration Award controls. Declaring the rights and other legal relations of the parties with respect to this dispute will evidently afford them relief from uncertainty and their ongoing controversy. And it is not clear that Seneca has available to it "another, more appropriate remedy" than its claim in this case for a declaratory judgment. *Glover v. State Farm Fire & Cas. Co.*, 984 F.2d 259, 261 (8th Cir. 1993) (per curiam) (explaining that "an important factor in exercising . . . discretion is whether the declaratory judgment plaintiff has another, more appropriate remedy").

The CBA provides that an "aggrieved employee . . . shall present any grievance to their supervisor within seven (7) calendar days after knowledge of the alleged contract violation occurs." (CBA, Art. 9, § 1.) There is no dispute that the Union has never filed a grievance concerning Seneca's 2025 PTO Policy. (Dkt. 13 ¶ 18 (admitting that the Union "did not file an additional grievance in response to the purported January 1, 2025 policy change").) The Union did not submit a grievance that challenged Seneca's authority to adopt the 2025 PTO Policy, nor the contents of the policy.

20

Nevertheless, the Union asserts that "if the Court considers Seneca's second counterclaim, it must find that the Arbitration Award applies beyond December 31, 2024[.]" (Dkt. 24 at 26.) But the law is clear that in a case under § 301 of the LMRA, unless the CBA exempts a dispute from the grievance procedures, employees and unions must attempt to use those procedures to seek redress for alleged violations of the contract. *Republic Steel Corp. v. Maddox*, 379 U.S. 650, 652–53 (1965); *see also Moore v. Gen. Motors Corp.*, 739 F.2d 311, 317 (8th Cir. 1984) ("Failure to exhaust the grievance procedures of the collective bargaining agreement is a defense to a suit on the collective bargaining agreement.").[8]

As noted above, the CBA plainly and unambiguously states that Seneca "has the right to make changes to the PTO policy[.]"[9] (CBA, Art. 8, § 4.) This language gives Seneca a unilateral contract right to make changes to the PTO policy, which it did when it enacted the 2025 PTO Policy. The 2025 PTO Policy plainly and unambiguously states that "[w]hen using PTO-Sick-Personal time, an employee is required to use enough time to

---

[8] The Union references language in the 2025 PTO Policy that states "[a]ny employee that is represented by a contractual bargaining agreement (CBA) may be excluded from this Policy." (Dkt. 25-2 at 3.) To the extent that the Union suggests its members are not covered by the Policy based on this language, the Court disagrees. The parties' CBA plainly states that "[a]ll employees are eligible to participate in the paid time off policy applicable to Minnesota employees in accordance with the terms of the policy." (CBA, Art. 8, § 1.)

[9] The CBA qualifies Seneca's right to make changes to the PTO policy. It says that Seneca has that power, "but only to the same extent that such modifications are made for all salaried and non-union hourly employees of the Company based in Minnesota." (CBA, Art. 8, § 4.) There is no evidence before the Court suggesting that when Seneca adopted the 2025 PTO Policy, it made changes that were applicable to only the Union and were inapplicable to other salaried and non-union employees. In fact, the record suggests the opposite is true and the 2025 PTO Policy applies to all its Minnesota employees.

cover their actual shift/workday." (Dkt. 25-2 at 4, ¶ 3.) The Union does not dispute that this plain language requires an employee who is scheduled to work more than eight hours in a shift to use more than eight hours of PTO. Further, it is undisputed that the new PTO policy became effective on January 1, 2025. (*Id.* at 1–2 (stating that "[t]his policy will be effective January 1, 2025"); *id.* at 3 (noting that the policy was "issued" on "01/01/2025").)

Given these undisputed facts, the Court concludes that Seneca is entitled to summary judgment on its second declaratory judgment counterclaim. The Union did not file a timely grievance under the CBA to challenge Seneca's implementation of the 2025 PTO Policy. The time for doing so has since expired. The CBA gave Seneca the right to implement that new PTO policy. Therefore, the Arbitration Award does not have any continuing effect after December 31, 2025.

## IV.    Attorney's Fees

Each side argues that the other should be required to pay its attorney's fees because the positions taken by their opponents were unreasonable. The LMRA does not expressly permit an award of attorney's fees, but an award may be "justified by circumstances in which the losing party has acted in bad faith." *Lackawanna Leather Co. v. United Food & Com. Workers Int'l Union*, 706 F.2d 228, 232 (8th Cir. 1983). The Court finds that the Union did not act unreasonably or frivolously in filing this action seeking confirmation of the award, nor did Seneca act in bad faith in opposing confirmation and seeking declaratory relief. This case involved a good faith disagreement, and an award of fees is not appropriate under the circumstances.

22

## ORDER

For the reasons discussed above, **IT IS HEREBY ORDERED THAT**:

1. Plaintiff's Motion for Summary Judgment (Dkt. 22) is **GRANTED IN PART** and **DENIED IN PART** as follows:

   a. The motion is **granted** to the extent that Plaintiff seeks relief under Count I of its Complaint, and the March 1, 2025 Arbitration Award is **CONFIRMED**;

   b. The motion is **granted** to the extent that Count I of Defendant's Counterclaims (Dkt. 6 at 9–11, ¶¶ 1–12 (Count I)) is **DISMISSED WITH PREJUDICE**;

   c. The motion is **denied** to the extent that Plaintiff asks the Court to conclude that the March 1, 2025 Arbitration Award applies beyond December 31, 2024 (*See* Dkt. 24 at 26); and

   d. The motion is **denied** to the extent that Plaintiff asks the Court for an award of attorney fees.

2. Defendant's Motion for Summary Judgment (Dkt. 27) is **GRANTED IN PART** and **DENIED IN PART** as follows:

   a. The motion is **denied** to the extent Defendant seeks a declaratory judgment under Count I of Defendant's Counterclaims stating that the March 1, 2025 Arbitration Award was not valid;

   b. The motion is **granted** to the extent that Defendant seeks a declaratory judgment under Count II of Defendant's Counterclaims (Dkt. 6 at 11, ¶¶ 13–20 (Count II)). The Court, therefore, **DECLARES** that the March 1, 2025 Arbitration Award has no application after December 31, 2024; and

   c. The motion is **denied** to the extent that Defendant asks the Court for an award of attorney fees.

   **Let Judgment be entered accordingly**.

Date: April 14, 2026

s/Katherine Menendez
Katherine Menendez
United States District Judge

23